GUNNISON and wife, Respondents, vs. KAUFMAN, Appellant.

*October 11—November 8, 1955.*

For the appellant there was a brief and oral argument by *Harlan W. Kelley* of Baraboo, attorney, and *Wayne W. Martin* of Madison of counsel.

For the respondents there was a brief by *Langer & Cross* of Baraboo, and oral argument by *Clyde C. Cross*.

FAIRCHILD, C. J. On November 6, 1952, at the time appellant S. J. Kaufman agreed to take over the corporation and pay certain obligations of Gunnison to the Reedsburg Bank, Gunnison was obligated to that bank on the following notes:

(1) An unsecured judgment note dated October 6, 1952, due December 2, 1952, for $7,000, with interest thereon at five per cent.

(2) A note dated October 6, 1949, due October 6, 1954, secured by a first real-estate mortgage on the premises of the said corporation and other real estate owned by plaintiff Ivor Gunnison and his wife individually, with balance of the principal then due of $20,000 with interest thereon at four per cent.

At the time of the original complaint appellant had paid $2,000 and interest on the secured note, and $1,000 on the unsecured note. During the interim between the time of the original complaint and the time of the trial, appellant had made final payment of the $20,000 secured note. Also during that interim, respondents, at the insistence of the bank, had paid the balance of the principal due on the unsecured note plus interest. As a result of the payments so made, there was a change in the amount owed by appellant to respondents. Appellant's counsel suggested the advisability of amending the complaint in order to bring the figures up to date. It appears to have been understood between counsel that the obligation on the secured note for $20,000 "had been paid and was out of the case." The case then before the court was upon pleadings showing that amount paid. The judgment sought by respondents in their amended complaint was for $6,271.88, the amount paid by them on the balance of the unsecured note plus interest, with interest from the date of payment.

At the time of the trial a motion for continuance was made by appellant on the grounds that sec. 263.10, Stats., allowed him twenty days in which to answer the amended complaint. The court denied appellant's motion, and appellant contends that such denial precluded him from forming a defense based on the amended complaint, and that therefore the denial was an abuse of discretion by the court.

A continuance delaying a trial is not a matter of course. A standard of requirements to warrant an adjournment is found in reported cases. " 'Such an application is always addressed to the sound discretion of the trial court, and prejudice must be made to appear in order to set aside its ruling thereon.' " *Estate of Hatten* (1940), 233 Wis. 256, 289 N. W. 630; *Rahles v. J. Thompson & Sons Mfg. Co.* (1909), 137 Wis. 506, 118 N. W. 350, 119 N. W. 289; *Kleimen-*

*hagen v. Dixon* (1904), 122 Wis. 526, 100 N. W. 826; *Druska v. Western Wisconsin Tel. Co.* (1922), 177 Wis. 621, 189 N. W. 152, and the decisions cited therein. The complaint was properly amended and served upon appellant's counsel. No substantial change to his disadvantage confronted the appellant because of the amended complaint, and no new issues arose because of any new facts introduced. The question of the existence of the contract was still the issue, and the amended complaint reflected the claimed obligations brought up to date. The case of *Erickson v. Westfield Milling & Electric Light Co.* (1953), 263 Wis. 580, 58 N. W. (2d) 437, relied upon by appellant, is not applicable here. In that case there was a wide change of issues, resulting from the amended complaint, and a counterclaim was filed. The record before us discloses a situation where the trial court was well warranted in denying appellant's motion. Sec. 270.145, Stats.

The second question before us whether there was a valid contract under which Kaufman agreed to pay the $7,000 unsecured note. Appellant claims that the $7,000 unsecured note was a personal liability of Gunnison, that he (Kaufman) did not promise to pay that note, and that the alleged promise to pay it is void under the statute of frauds as being a promise, not in writing, to answer for the debt, default, or miscarriage of a third person. With respect to the application of the statute of frauds: The alleged promise which Kaufman made to get Gunnison "off the hook" and personally take care of the two obligations at the Reedsburg Bank was not a promise to answer for the debt of Gunnison to the bank. It was a promise made as part of a purchase deal in which Kaufman, the purchaser, and Gunnison, the seller, agreed that Kaufman's undertaking to pay those existing obligations was to be part of the purchase price for the property he (Kaufman) received. In other words, the promise merely specified the method by which the promisor (Kaufman) was to pay

off his own obligations to the promisee (Gunnison) for the transfer of the corporation property to him (Kaufman). The statute of frauds clearly does not apply to such a situation. The rule is plainly stated in *Fosha v. O'Donnell* (1904), 120 Wis. 336, 97 N. W. 924, where the holder of the notes brought action directly against the defendant purchasers on the basis of his oral promise to the seller and original obligor. At page 340 it was there said:

"Such an agreement it is held is not in effect an undertaking in the nature of a 'special promise to answer for the debt, miscarriage, or default of other persons,' though it is collateral to the liability of the original debtor to pay the same debts. The agreement is not a mere promise to answer for another's liability contemplated by the statutes requiring such agreements to be in writing, expressing the consideration, and signed by the party sought to be charged. It is an agreement that the defendant O'Donnell will pay his debt to Prosser in a particular manner, by discharging these notes held by plaintiff, based upon the consideration between him and Prosser at the time the agreement was made."

The evidence accepted as controlling is that in 1948 or 1949 respondent Gunnison and one Earl Schilling entered into the business of manufacturing cultivators as partners. For the purpose of constructing a factory, they borrowed $26,000 on a secured judgment note from the Reedsburg Bank. On an unsecured note they borrowed from the same bank an additional $30,000 for materials and cash to enable the company to operate. They later incorporated as Schilling and Gunnison, and Schilling and his wife and Gunnison and his wife, between them, owned all the stock. The mortgages given to the bank were on the factory and the homes of the stockholders. Later Gunnison bought out Schilling with money obtained also from the Reedsburg Bank, and the corporation became known as the Baraboo Manufacturing, Inc., and additional stock was sold to other persons. Pay-

ment of the money with which Gunnison bought out Schilling was guaranteed up to $25,000 by a note signed by one L. C. Welch, who retained as security 225 shares of stock formerly owned by Ivor Gunnison. In addition to the money thus borrowed, Gunnison personally put into the corporation some $16,000 of his own to keep the business running.

The venture was unsuccessful, and in August, 1952, S. J. Kaufman, an officer in the Industrial Spring Corporation of Chicago, a creditor of Baraboo Manufacturing, Inc., after conferences in Chicago and Baraboo, agreed to take over the business and compromise its debts. On November 6, 1952, a meeting was held in Baraboo at which Kaufman and all the stockholders were present. At this meeting it was first suggested by Kaufman to the stockholders that they cancel any obligations the corporation had to them and turn all their stock over to him without compensation. That proposition was not accepted. Mr. Kaufman then left the room and there was a discussion among the stockholders. When he returned he made a second proposal, namely, that the stockholders assign their claims against the corporation and turn over all of their stock for a nominal price. It was at that time that the alleged promise of Kaufman was made "to get Ivor Gunnison off the hook" and personally pay the two obligations at the Reedsburg Bank. The following agreement was dictated by Kaufman and later put in writing and signed by the stockholders

"W the undersigned agree to assign to Martin S. Gordon (attor. ey at law) the corporation stock of Baraboo Manufacturing, Inc., plus all loans made from the undersigned to Baraboo Manufacturing, Inc., for X numbers of dollars, and agree to assign all loans due us from Baraboo Manufacturing, Inc., to Martin S. Gordon (attorney at law) for X number of dollars."

The agreement between Kaufman and Gunnison under which Kaufman was to pay the two notes at the Reedsburg

Bank was not put in writing. However, there was testimony
to the effect that some discussion was had about putting into
the written agreement details about the payment of the
$7,000 note and mortgage, but Kaufman said that it would
not be necessary because everyone understood about it, and
that he was a gentleman of his word and would live up to his
promise. Further, the testimony shows that the written
agreement set forth above was signed by the stockholders in
full reliance upon the oral promise of Kaufman to take care
of all creditors and the bank notes. One witness testified:
"He [Kaufman] said we had nothing to lose—everything
was gone, and that Ivor was the only one to lose anything.
If he got all of our stock he would assume all obligations so
Ivor would not have to lose his home and business. He told
us that before we signed anything." Gunnison and other
stockholder witnesses testified to the same effect.

The two loans made by the Reedsburg Bank for a building
and for material and cash were made in 1948 or 1949, when
Ivor Gunnison and Earl Schilling were partners. When the
business was later incorporated, the Reedsburg Bank re-
fused to transfer those obligations to the corporation, but
insisted that the original partners remain personally liable to
it. Both loans were used in carrying on the business of the
partnership and corporation. The original obligations were
gradually reduced by payments to the bank made from earn-
ings of the business, and the notes were renewed from time
to time. There is no doubt that the obligations of the two
notes were carried on the books of the corporation and treated
as company debts to the bank. When Kaufman became in-
terested in Baraboo Manufacturing, Inc., he sent his own
auditors from Chicago to audit the corporation. In the audit
report, which they submitted to him, both the $20,000 secured
note and the $7,000 unsecured note were listed as obligations
of the corporation owed to the Reedsburg Bank. An earlier
audit report prepared by C. P. A. John Hoppe, also listed

those obligations as company liabilities. Therefore, when Kaufman, on November 6, 1952, agreed to assume the obligations of the corporation to the bank, he was well aware that the $7,000 unsecured note was a part of the obligations he was assuming. Furthermore, on May 6, 1953, $1,000 was paid to the Reedsburg Bank with a check drawn on the First National Bank of Baraboo by Baraboo Manufacturing, Inc. That $1,000 was applied to the $7,000 unsecured note, and the bank gave Gunnison a receipt for the same. It is undisputed that after selling the building of the corporation, Kaufman paid the $20,000 mortgage note. Thus part performance of the contract is clearly in evidence. A week or two after Kaufman paid the $1,000, he informed Gunnison that he was not going to make any further payments on the $7,000 note. Gunnison subsequently paid the balance of that note to the bank.

Appellant contends that he is not bound by the alleged promise because the transfer of the stock and assignment of claims was made before November 6, 1952. It is true that all of the stock of Baraboo Manufacturing, Inc., except the 225 shares referred to above, was indorsed in blank and sent to Chicago by mail on October 31, 1952, to Kaufman's attorney, by Gunnison, with the promise that Kaufman would have the 225 remaining shares "on Monday morning." An accompanying letter contained resignations of all of the officers. And on November 4, 1952, Gunnison assigned to Kaufman for $10 all claims by him on Baraboo Manufacturing, Inc. However, the record reveals that the checks given by Kaufman to Gunnison for his assignment to Kaufman of claims against the corporation amounting to some $16,000 were made payable on January 6, 1953; and the two notes given by Kaufman to Gunnison as a part of the deal were both executed on November 6, 1952, and due January 6, 1953. Appellant's own testimony on adverse examination, admitted by appellant, was that "The agreement of Novem-

ber 6, 1952, was merely an agreement of intent or willingness to consummate this deal." He was asked, "And in what fashion was it actually consummated in January, what do you have reference to there as consummating it?" and he answered, "The turning over of the stock and signing of the stock." Furthermore, a letter dated March 2, 1953, contains the statement by Kaufman to the effect that he had bought both the 444 shares of stock and the loans by Gunnison to Baraboo Manufacturing, Inc., from Gunnison and his wife on January 6, 1953. This evidence corroborates the testimony of Gunnison that the stock certificates sent to Kaufman's attorney in October, 1952, were sent merely for the purpose of examination.

From the foregoing it is plain that respondents transferred to appellant 444 shares of stock in Baraboo Manufacturing, Inc., and also assigned to appellant their claims amounting to some $16,000 against the corporation for its indebtedness to them. In exchange for the transfer of stock and assignment of claims, the Gunnisons received, in addition to the Kaufman promise to pay the two notes at the bank, a note for $519.80, the amount necessary to get Gunnison's stock released from the lien held by the estate of L. C. Welch, and $15, and two checks for $10. The contention of appellant that the agreement is void for lack of consideration cannot be sustained.

It is unnecessary, it seems to us, to further repeat or analyze the testimony. The findings of fact are supported by the evidence. Appellant is liable to respondents for the amount of $6,271.88 which they paid on the balance of the $7,000 note subsequent to the payment by Baraboo Manufacturing, Inc., of $1,000, with interest from the time of payment.

*By the Court.*—Order and judgment affirmed.